# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2116

UNITED STATES OF AMERICA

v.

DERBY CLERFE,

Appellant

_____

Appeal from the U.S. District Court for the
Western District of Pennsylvania
Judge William S. Stickman IV, No. 2:20-cr-00105

Before: CHAGARES, *Chief Judge*, PORTER, and ROTH,
*Circuit Judges*
Argued Sep. 10, 2025; Decided Aug. 10, 2026

OPINION OF THE COURT

PORTER, *Circuit Judge*.

Derby Clerfe purchased handguns in the United States and smuggled them to the Republic of Haiti in violation of numerous federal laws. He was indicted for and later pleaded guilty to one count of conspiring to violate federal laws that prohibit exporting firearms without filing an export

information in violation of 18 U.S.C. § 371. On appeal, Clerfe raises Second Amendment and non-delegation challenges to his conviction. Both fail, so we will affirm the judgment of the District Court.

I

A

Between December 2017 and February 2018, Clerfe purchased nine 9mm handguns from a sporting goods store in Monroeville, Pennsylvania. Federal authorities flagged that purchasing pattern as suspicious and interviewed Clerfe at his home in March 2018. Clerfe admitted that he had already arranged for the guns to be shipped to Haiti through an out-of-state resident who had a "connect" with an unknown shipping company. App. at 107. Clerfe stated that to his knowledge the guns had not been declared and suggested that the guns may have been hidden in barrels. He also informed federal authorities that he had recently visited Haiti, but that none of the guns had arrived before he returned to the United States.

Clerfe was charged with one count of conspiring to commit an offense against the United States in violation of 18 U.S.C. § 371 and two counts of transferring firearms to an unlicensed out-of-state resident in violation of 18 U.S.C. § 922(a)(5). The District Court granted Clerfe's motion for a bill of particulars as to the count of conspiracy. The government pointed to several federal laws that make smuggling firearms into Haiti illegal. Clerfe then moved to dismiss the indictment on Second Amendment, non-delegation, and vagueness grounds. After the District Court denied that motion, Clerfe pleaded guilty to one count of conspiracy, reserving the right to appeal the denial of his

motion to dismiss the indictment on Second Amendment and non-delegation grounds. This appeal timely followed.

B

More than one federal law prohibits smuggling firearms into Haiti. First, generally applicable import and export laws make it a crime to knowingly fail to file an export information sheet when exporting goods from the United States. 13 U.S.C. § 305(a)(1). Regulations exempt some exports from this filing requirement, but no such exemption exists for exports covered by the International Traffic in Arms Regulations ("ITAR"). *See* 15 C.F.R. § 30.2(a)(1)(iv)(B)–(C). Exports covered by ITAR include those items listed on the United States Munitions List ("USML"). *See* 22 C.F.R. § 120.2. The USML comprises items designated as "defense articles" for the purposes of the Arms Export Control Act ("AECA"). *See* 22 U.S.C. § 2778(a)(1). The AECA authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to "designate those items which shall be considered as defense articles and defense services." *Id*. At the time of Clerfe's conduct, 9mm handguns were designated as defense articles on the USML.[1] *See* 22 C.F.R. § 121.1 (Aug. 30, 2017) (including "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive (12.7mm).").

Second, ITAR requires exporters of "defense articles" to electronically file certain "export information" with the

---

[1] Nonautomatic and semi-automatic weapons were undesignated as "defense articles" and removed from the USML in 2020. International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819, 3823–24 (Jan. 23, 2020) (effective Mar. 9, 2020).

3

United States Customs and Border Protection. 22 C.F.R. § 123.22(a), (b).

Third, the AECA makes it unlawful to export designated "defense articles" "without a license" to do so. 22 U.S.C. § 2778(b)(2); *see also* 22 C.F.R. § 127.1(a)(1). Haiti, moreover, remains subject to a longstanding arms embargo, during which it has been "the policy of the United States to deny licenses or other approvals for exports or imports of defense articles." *See* 22 C.F.R. § 126.1(a), (d)(2), (j).

Fourth, it is a crime to export goods "contrary to any law or regulation of the United States." 18 U.S.C. § 554(a).

## II

The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291. For orders denying a criminal defendant's motion to dismiss an indictment, we review the District Court's legal conclusions de novo and factual findings for clear error. *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011).

## III

Clerfe makes two challenges to his indictment. First, he argues that the various laws prohibiting the export of firearms without filing an export information violate his Second Amendment rights. Second, he asserts that by authorizing the President to designate which "defense articles" comprise the USML, the AECA effects an unconstitutional delegation of legislative authority to the executive. We address each in turn.

## A

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Those words "guarantee the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court announced the constitutional standard that courts apply in Second Amendment cases. 597 U.S. 1, 24 (2022). First, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. Second, the government bears the burden of demonstrating that the regulation implicating presumptively protected conduct "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Opining further on that standard, the Supreme Court has instructed that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). The challenged regulation "need not be a 'dead ringer' or a 'historical twin,'" but it must be "relevantly similar" such that it "appl[ies] faithfully the balance struck by the founding generation to modern circumstances." *Id*. (citation omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id*. "Why" relates to the "particular problems" at which the firearm regulation is addressed, whereas "how" relates to the "extent" or burden of the firearm regulation. *Id*.

1

As an adult citizen, Clerfe belongs to "the people" and the handguns at issue are protected "arms" within the meaning of the Second Amendment. *Bruen*, 597 U.S. at 31–32; *see also*

5

*Range v. Att'y Gen.*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc). On this, everyone agrees. Where the parties disagree is whether Clerfe's conduct—trafficking arms to Haiti—is covered by the Second Amendment's plain text; "to keep and bear Arms." We agree with the government that "keep[ing] and bear[ing[] Arms" does not encompass sending them abroad in violation of arms-trafficking laws.

We begin with *Heller*, which explicated the meaning of the phrases "keep arms" and "bear arms." *Heller*, 554 U.S. at 582. Looking to founding-era dictionaries and treatises, the Supreme Court concluded that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"[2] *Id*. at 582–83. Those same founding-era sources (and common sense) confirm that having weapons entails some degree of physical possession or control. Samuel Johnson's *A Dictionary of the English Language*[3] defines "keep" as "[t]o retain; not to lose," "[t]o have in custody," "[t]o preserve; not to let go," "[t]o hold for another," "[t]o have in the house," "[t]o maintain; to hold." Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773). Likewise, Noah Webster's

---

[2]    The parties do not primarily focus on whether Clerfe's conduct is covered by the phrase "bear Arms," which *Heller* read to mean "to carry" weapons for the "particular purpose" of "confrontation." 554 U.S. at 584.

[3]    Gregory E. Maggs, A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution, 82 Geo. Wash. L. Rev. 358, 359 (2014) (noting the various editions of Samuel Johnson's *A Dictionary of the English Language* as "one of the most authoritative eighteenth-century dictionaries.").

6

*An American Dictionary of the English Language*[4] defines "keep" as "[t]o hold; to retain in one's power or possession; not to lose or part with," "[t]o have in custody for security or preservation," "[t]o preserve; to retain," "[t]o have in the house," and "[t]o hold in one's own bosom." Noah Webster, *An American Dictionary of the English Language* (1828) [hereinafter Webster]. As *Heller* put it, "'[k]eep arms' was simply a common way of referring to possessing arms." 554 U.S. at 583.

By comparison, Clerfe's conduct—exporting arms abroad—involved *dis*possessing himself of firearms. That is fatal to his *Bruen* step-one argument. Yet, Clerfe seizes on the phrase "in one's power" in Webster's dictionary and argues that to "keep Arms" "include[s] the ability to sell, trade, and export arms." Clerfe's Br. at 20. We reject that broad conception of what it means to "keep Arms." Our starting premise is that the Constitution's "words and phrases" are understood according to their "normal and ordinary" meaning. *Heller*, 554 U.S. at 576. Reading "keep Arms" to include "giving away Arms" would conflict with that most basic rule of constitutional interpretation.

As a fallback, Clerfe argues that even if exporting arms abroad does not count as "keep[ing] Arms," his conduct is covered by the plain text because the Second Amendment prohibits all "infringe[ments]," which he reads to mean anything that hinders the right. He suggests that "even the smallest burden" hinders the right. Clerfe's Br. at 21. Clerfe relatedly points to pre-*Bruen* caselaw recognizing that the

---

[4]     Maggs, *supra* note 3 at 389 (noting that the Supreme Court often cites Noah Webster's 1828 *An American Dictionary of the English Language*).

7

Second Amendment right, like other rights, "implicitly protect[s] those closely related acts necessary to [its] exercise."[5] *Luis v. United States*, 578 U.S. 5, 26 (2016)

---

[5] Before *Bruen*, two Circuits had held that the Second Amendment protects certain "necessary concomitant[s]" such as the right to firearms training, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), and the right to acquire ammunition, *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). *New York State Rifle & Pistol Ass'n Inc. v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting). Four sitting Justices had also embraced the idea. *See Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1192–93 (6th Cir. 2024) (counting Justices). After *Bruen*, three Circuits have addressed the tension between "implied corollary rights" and *Bruen*'s step one, which "ground[s] Second Amendment analysis in the Constitution's plain text." *Id*. at 1196. The Ninth Circuit has held that the plain text of the Second Amendment covers regulations of ancillary rights if the regulation "meaningfully constrains" the core right. *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024). The Sixth Circuit has held that the plain text of the Second Amendment covers regulations of ancillary rights if the regulation "restrict[s] conduct necessary to effectuate" the core right. *Oakland Tactical Supply*, 103 F.4th at 1196. The Second Circuit has also weighed in, following the Ninth Circuit in adopting the "meaningfully constrain" test. *United States v. Vereen*, 152 F.4th 89, 93 (2d Cir. 2025), *cert. denied*, *Perez v. United States*, 223 L. Ed. 2d 536 (Jan. 12, 2026) (citing *Gazzola v. Hochul*, 88 F.4th 186, 195–98 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024)).

(Thomas, J., concurring); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the right to "keep and bear Arms" implies a right "to acquire and maintain proficiency" in the "use" of firearms); *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (holding that the right to "keep and bear Arms" "implies a corresponding right to obtain the bullets necessary to use them."); *see also Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."); *but see Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1198 (6th Cir. 2024) (holding post-*Bruen* that "commercial training in a particular location" is "not protected by the plain text of the Second Amendment"). We agree with those authorities. But Clerfe's argument is tautological: His right to "keep Arms" was not "infringed" for the same reason that exporting arms abroad is not protected by the right to "keep Arms" in the first place.

Our decision in *Frein v. Pennsylvania State Police* accords. 47 F.4th 247 (3d Cir. 2022). In *Frein*, police seized firearms as potential evidence related to the shooting of two law enforcement officers. *Id*. at 250. Even after the defendant had lost his last direct appeal, and even though neither the owners of the firearms nor the firearms themselves had been involved in the crime, police refused to return them. *Id*. The owners sued, arguing that their Second Amendment rights, among others, had been violated. *Id*. We agreed and emphasized that by its plain text, "[t]he government may not 'infringe[]'" on the Second Amendment right. *Id*. at 254 (second alteration in original). "That guarantee," *Frein*

9

explained, "of course, forbids 'destroying' the right by banning gun ownership, but it also forbids lesser 'violations' that 'hinder' *a person's ability to hold on to his guns*." *Id*. (cleaned up) (emphasis added) (quoting Webster). Though Clerfe is correct that "infringements" include "lesser violations," the laws prohibiting him from exporting firearms abroad without a license do not limit his "ability to hold on to his guns." *Id*. In fact, they limit his ability to send his guns abroad.

Finally, Clerfe cites to this Court's pre-*Bruen* caselaw stating that "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 222 (3d Cir. 2021). Clerfe stretches that language much too far. The explicit lesson of those cases is that it matters whether a commercial regulation impinges upon the "right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. After all, "[i]f there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable." *Marzzarella*, 614 F.3d at 92 n.8; *see also Drummond*, 9 F.4th at 227. So in *Marzzarella* we determined that 18 U.S.C. § 922(k)'s prohibition against selling firearms with an obliterated serial number did not violate the Second Amendment in part because "unmarked firearms are functionally no different from marked firearms." 614 F.3d at 94. Likewise in *Drummond*, we concluded that a zoning ordinance prohibiting certain firearms from a shooting range implicated the Second Amendment because "[a] right to bear those weapons, after all, 'wouldn't mean much without the

training and practice that make [them] effective.'" 9 F.4th at 227 (quoting *Ezell*, 651 F.3d at 704).

Put differently, a commercial regulation cannot end-run the "individual right to possess and carry weapons," but if the regulation does nothing to "infringe[]" upon that right, the Second Amendment is not implicated. *Heller*, 554 U.S. at 592. Because the laws that prohibit Clerfe from exporting handguns to Haiti do not limit his right to "keep and bear Arms," the plain text of the Second Amendment does not protect the conduct at issue.

2

Even assuming the Second Amendment covers Clerfe's conduct, the government has shown that the challenged laws prohibiting the export of weapons abroad are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Since the founding of the Republic to the present day, Congress has restricted the exportation of weapons abroad. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 327 (1936) (noting that generally applicable export restrictions have been "enacted by nearly every Congress from the beginning of our national existence to the present day"). In 1794, just three years after the Second Amendment was adopted, the Third Congress passed a law titled "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same." Act of May 22, 1794, 1 Stat. 369. That statute made it unlawful "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados, gunpowder," etc. *Id*. Likewise, the Ninth Congress "suspend[ed] the commercial intercourse between the United States, and certain parts of the island of St.

11

Domingo"—modern-day Haiti. Act of Feb. 28, 1806, 2 Stat. 351. And the Tenth Congress for its part promulgated the Embargo Act of 1807 which prohibited the export of all goods, including firearms, from the United States. Act of Dec. 22, 1807, 2 Stat. 451. The Congresses that enacted these laws included John Adams, Oliver Ellsworth, Rufus King, Albert Gallatin, Robert Morris, James Monroe, Joseph Story, Jonathan Trumbull, James Madison, Henry Clay, John Quincy Adams, and others who knew a thing or two about the Constitution.

Clerfe resists these historical analogues, arguing that they, especially the 1794 law, addressed different societal problems and imposed different burdens. He claims that the 1794 law had nothing to do with the foreign-policy concerns that motivate modern-day arms export regulations. Though the 1794 law, titled "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, *and encouraging the Importation of the same*" seems to have been enacted, in part, to increase the domestic stock of firearms, it strains credulity to think that foreign-policy considerations were not also relevant. *See* Letter from Alexander Hamilton to Robert Purviance (Aug. 22, 1794), *in* Founders Online, Nat'l Archives & Records Admin., https://perma.cc/FTG7-WUL7 (last visited May 18, 2026) (outlining Hamilton's concerns about illicit arms being exported to foreign nations despite the 1794 Act). But even spotting Clerfe that difference, other generally applicable founding-era export controls addressed the same sort of foreign-policy considerations. *See, e.g.*, Act of March 3, 1795, 1 Stat. 444 (authorizing the export of arms "in cases connected with the security of the commercial interest of the United States"); Act of Feb. 28, 1806, 2 Stat. 351, 352 (authorizing the President to discontinue the embargo of Haiti

12

"if he shall deem it expedient and consistent with the interest of the United States").

Clerfe next argues that the 1794 law did not impose a relevantly similar burden to modern export controls because it operated for one year and applied only to goods in the stream of commerce.[6] But again, other generally applicable founding-era export controls were more expansive. *See* Act of Dec. 22, 1807, 2 Stat. 451. In any event, the government need not point to "a dead ringer or a historical twin" to prevail. *Rahimi*, 602 U.S. at 692 (quotation marks omitted).

Finally, Clerfe points to a historical analogue of his own, but it does not support his position. A 1795 law authorized "the exportation of arms, cannon and military

---

[6] Clerfe and the government point to *United States v. La Vengeance* to support their respective positions about whether the 1794 law applied solely to firearms in the stream of commerce. 3 U.S. 297 (1796). In that case, the United States government initiated a criminal forfeiture action against *La Vengeance*, a French privateer. *Id*. at 297. The United States argued that *La Vengeance* violated the 1794 law by sailing from New Jersey to Haiti laden with "cannons, muskets, and gun-powder." *Id*. A District Court concluded that *La Vengeance* violated the 1794 law, but the Circuit Court reversed. *Id*. at 298. The Circuit Court concluded that *La Vengeance* had not violated the 1794 law because the "muskets were the private property of French passengers on board . . . carried out for their own use and not by way of merchandize." *Id*. Likewise, the gun-powder "was a part of [*La Vengeance*'s] equipment . . . and was not exported by way of trade or merchandize." *Id*. The Supreme Court affirmed the Circuit Court on jurisdictional grounds. *Id*. at 301.

13

stores" "in cases connected with the security of the commercial interest of the United States, and for public purposes" subject to Presidential approval. Act of March 3, 1795, 1 Stat. 444. That founding-era law bears an uncanny resemblance to the AECA, which requires compliance with federal regulations to export a defense article. *See* 22 U.S.C. § 2778(b)(1). It might not be "a 'dead ringer' or a 'historical twin'" to the modern law, but it comes close. *Rahimi*, 602 U.S. at 692.

B

The Vesting Clauses of Articles I, II, and III lodge the legislative, executive, and judicial powers, respectively, in the separate branches of our government. That separation of powers established more than a starting place from which later generations could rearrange the Constitution's careful balance of powers: it was a promise that the exercise of legitimate governmental power would comport with the prescribed processes requiring cooperation between the different branches. *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also* Federalist No. 51 (James Madison).

The non-delegation doctrine guards that promise, though it has proven to be an imperfect sentinel at times. The current non-delegation doctrine permits Congress to delegate its legislative power to the Executive so long as it articulates an "intelligible principle" to guide the exercise of that power. *Gundy*, 588 U.S. at 162–64 (Gorsuch, J., dissenting) (tracing the evolution of the intelligible-principle test). Caselaw upholding rather broad delegations of legislative power has demonstrated that "intelligible" is not a high bar. *See, e.g.*, *Lichter v. United States*, 334 U.S. 742, 778 (1948) (authorizing the War Department to recover "excessive profits" earned on military contracts); *Yakus v. United States*, 321 U.S. 414, 426–

14

27 (1944) (authorizing the Price Administrator to fix "fair and equitable" commodities prices); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943) (authorizing the Federal Communications Commission to regulate broadcast licensing in the "public interest"); *see also Gundy*, 588 U.S. at 146 (stating that the standard imposed by the intelligible-principle test is "not demanding"). Only twice has the Supreme Court determined that a statute violates the non-delegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935). Yet, "no one thinks that the Court's quiescence can be attributed to an unwavering new tradition of more scrupulously drawn statutes." *Gundy*, 588 U.S. at 162 (Gorsuch, J., dissenting).

It is not surprising then that four Justices have expressed doubts about the intelligible-principle test. *Gundy*, 588 U.S. at 149 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); *id*. at 148 (Alito, J., concurring in the judgment). Still, even as the intelligible-principle test withers, we are obligated to apply it "unless and until it is overruled." *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring). Applying that permissive standard here, the District Court did not err by denying Clerfe's motion to dismiss his indictment on non-delegation grounds.

1

Since the applicable standard asks "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion," non-delegation analysis generally begins with statutory interpretation. *Gundy*, 588 U.S. at 135–36. After all, the answer to the constitutional question hinges on "what task [the statute] delegates and what instructions it provides." *Id*.

15

After "a court interprets the statute, it may find that the constitutional question all but answers itself." *Id*.

That was the case in *Gundy*, which considered the Sex Offender Registration and Notification Act's ("SORNA") delegation to the Attorney General that he "specify the applicability of [the Act] to sex offenders convicted before [its] enactment . . . and to prescribe rules for the registration of any such sex offenders." *Id*. at 133–34 (quoting 34 U.S.C. § 20913(d)). If that provision in fact "grant[ed] the Attorney General plenary power to determine SORNA's applicability to pre-Act offenders," the *Gundy* plurality recognized that there would have been "a nondelegation problem." *Id*. at 136. Instead, it read that language "to [not only] require the Attorney General to apply SORNA to all pre-Act offenders as soon as feasible" but to also grant him discretion in "considering and addressing feasibility issues." *Id*. To arrive at that interpretation, the *Gundy* plurality read § 20913(d) against the backdrop of SORNA's other provisions, including the statute's "declaration of purpose." *Id*. at 141–43 (quoting 34 U.S.C. § 20901) (alterations omitted).

Like the *Gundy* plurality, we begin with the language of the statute. The AECA authorizes the President to "[i]n furtherance of world peace and the security and foreign policy of the United States . . . designate those items which shall be considered as defense articles and defense services," which constitute the USML. 22 U.S.C. § 2778(a)(1). Clerfe argues that furthering "world peace and the security and foreign policy of the United States" is too "broad and amorphous" to be intelligible. Clerfe's Br. at 39. But the AECA's other provisions, like SORNA's, supply further clarification as to how the President must exercise that delegated power. In another provision, the AECA provides that it is "the policy of

16

the United States to exert leadership in the world community to bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments." 22 U.S.C. § 2751. It further provides that "programs for or procedures governing the export, sale, and grant of defense articles . . . shall be administered in a manner which will carry out this policy." *Id*. With that additional context, § 2778(a)(1) resembles other broad delegations that have passed muster.

*Touby v. United States*, for instance, upheld the Controlled Substances Act's ("CSA") delegation to the Attorney General to temporarily list a substance on Schedule I if he deemed it "necessary to avoid an imminent hazard to the public safety." 500 U.S. 160, 163 (1991) (quoting 21 U.S.C. § 811(h)(1)). Decisions to list a substance on Schedule I, like the decision to designate an item as a "defense article" on the USML, makes otherwise lawful conduct criminal. *See, e.g.*, 21 U.S.C. §§ 841–44. Like invoking the CSA's temporary scheduling provision, removing an item previously designated as a "defense article" under the AECA requires 30-days notice. 21 U.S.C. § 811(h)(1); 22 U.S.C. § 2778(f)(1). Also somewhat like the interim nature of the temporary scheduling provision, the AECA requires the President to "periodically review the items on the United States Munitions List to determine what items, if any, no longer warrant export controls." 22 U.S.C. § 2778(f)(1). Finally, both provisions require the Executive to abide by various reporting requirements. *See* 22 U.S.C. § 2778(f)(1); 21 U.S.C. § 811(h)(4). Though these procedural requirements do not necessarily answer whether Congress has "la[id] down by legislative act an intelligible principle to which the [Executive] . . . is directed to conform," *Touby* suggests they are relevant since they provide "specific restrictions on

17

the [Executive's] discretion" and thus, "satisfy the constitutional requirements of the nondelegation doctrine." 500 U.S. at 165, 167; *accord United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011) (considering the International Emergency Economic Powers Act's "several procedural restrictions") (quoting *Regan v. Wald*, 468 U.S. 222, 249 (1984) (Blackmun, J., dissenting)); *United States v. Henry*, 888 F.3d 589, 597 (2d Cir. 2018) (considering the AECA's procedural requirements).

Also, this Court in *Amirnazmi* upheld an arguably more sweeping delegation of legislative authority to the President under the International Emergency Economic Powers Act ("IEEPA"). 645 F.3d at 576. Subject to limited exceptions, the IEEPA authorizes the President to regulate international trade if he first determines that there is an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States" and he "declares a national emergency with respect to such threat." 50 U.S.C. §§ 1701–02; *see also Amirnazmi*, 645 F.3d at 573–74 (describing limited exceptions). That broad delegation includes the power to criminalize otherwise lawful conduct. *See* 50 U.S.C. § 1705(a). Still, we concluded that the IEEPA did not fail the intelligible-principle test because that delegation was not too broad and the IEEPA contained "several procedural restrictions on the President's exercise of the national-emergency powers." *Amirnazmi*, 645 F.3d at 577 (quoting *Regan*, 468 U.S. at 249 (Blackmun, J., dissenting)).

Every Circuit that has addressed the constitutionality of § 2778(a)(1) has held that it passes the intelligible-principle

18

test.[7] *Henry*, 888 F.3d at 595–98; *United States v. Hsu*, 364 F.3d 192, 204–05 (4th Cir. 2004); *United States v. Chi Tong Kuok*, 671 F.3d 931, 938–39 (9th Cir. 2012). For the reasons above, we join that consensus.

2

We next address Clerfe's argument that the non-delegation doctrine "requires a more demanding inquiry than the modern intelligible-principle test" in the criminal context. Clerfe's Br. at 41. Confronted with the same argument in *Touby*, the Supreme Court declined to decide whether "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions." 500 U.S. at 165–66. Following *Touby*'s lead, we have also abstained from deciding that question. *United States v. Cooper*, 750 F.3d 263, 271 (3d Cir. 2014) (citing *Touby*); *Amirnazmi*, 645 F.3d at 575 (same). And we continue to do so here. But of the six sitting Justices that comprised the Court deciding *Gundy*, four stated

---

[7]  Every Circuit that addressed the constitutionality of materially identical language in 22 U.S.C. § 1934, the predecessor to 22 U.S.C. § 2778(a)(1), likewise upheld it. *Samora v. United States*, 406 F.2d 1095, 1098 (5th Cir. 1969); *United States v. Stone*, 452 F.2d 42, 47 (8th Cir. 1971); *United States v. Gurrola-Garcia*, 547 F.2d 1075, 1078–79 (9th Cir. 1976). *See also* 22 U.S.C. § 1934 (repealed 1976) ("The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war . . . The President is authorized to designate those articles which shall be considered as arms, ammunition, and implements of war . . . for the purposes of this section").

19

that they would reconsider the intelligible-principle standard. *Gundy*, 588 U.S. at 149 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); *id*. at 148 (Alito, J., concurring in the judgment).

Even analyzing Clerfe's claim under the heightened standard that he requests, we conclude that his non-delegation challenge still fails. Without providing an all-purpose metric with which to decide all non-delegation cases, Justice Gorsuch's dissenting opinion in *Gundy* articulated three "important guiding principles" of permissible delegations. *Gundy*, 588 U.S. at 157 (Gorsuch, J., dissenting). First, "as long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to 'fill up the details.'" *Id*. "Second, once Congress prescribes the rule governing private conduct, it may make the application of that rule depend on executive fact-finding." *Id*. at 158. "Third, Congress may assign the executive and judicial branches certain non-legislative responsibilities" meaning that "when a congressional statute confers wide discretion to the executive, no separation-of-powers problem may arise if 'the discretion is to be exercised over matters already within the scope of executive power.'" *Id*. at 159 (quoting David Schoenbrod, The Delegation Doctrine: Could the Court Give It Substance?, 83 Mich. L. Rev. 1223, 1260 (1985)).

Those principles neatly resolve Clerfe's non-delegation challenge to the AECA. *First*, § 2778(a)(1)'s delegation to the President to "designate those items which shall be considered as defense articles" comprising the "United States Munitions list" is quintessentially filling up the details. Through the AECA, Congress articulated a general policy—reducing the international arms trade in order to lessen regional conflict—and authorized the President to list the arms that should be

20

subject to export restrictions in light of that policy and the interests of "world peace and the security and foreign policy of the United States." 22 U.S.C. §§ 2778(a)(1), 2751. No doubt, the AECA is a "consequential statute[]," but it "set[s] forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed," so it avoids non-delegation problems. *Gundy*, 580 U.S. at 158 (Gorsuch, J., dissenting) (quoting *Yakus*, 321 U.S. at 426). *Second*, determining the list of arms subject to export restrictions "[i]n furtherance of world peace and the security and foreign policy of the United States" unambiguously implicates the President's exclusive prerogative to conduct foreign affairs and duty to serve as Commander in Chief. *See* U.S. Const. art. II, §§ 2–3. Of course, "foreign policy of the United States" and like phrases are not shibboleths. But in the context of international trade, the President's authority does not rest entirely on "an exertion of legislative power," rather it derives from legislation "plus the very delicate, plenary, and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss-Wright Export Corp.*, 299 U.S. at 319–20. In cases like these, the President is entitled to "a degree of discretion and freedom from statutory restriction." *Id.* at 320. Such allowances rightly put a thumb on the scale in favor of upholding the delegation.

\*　　\*　　\*

For the reasons above, we will affirm the District Court's denial of Clerfe's motion to dismiss the indictment on Second Amendment and non-delegation grounds.

Adam N. Hallowell [ARGUED]
Laura S. Irwin
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
*Counsel for Appellee*

Stacie M. Fahsel [ARGUED]
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
*Counsel for Appellant*